Oyez, oyez, oyez. The Honorable Appellate Court, 5th District, State of Illinois, is now in session. The Honorable Justice Bowie presiding, along with Justice Cates and Justice McKinney. The first case this morning is 5-23-0073, GridLiance Heartland LLC v. Illinois Commerce Comm'n et al. Arguing for the appellant is Jim Lang. Arguing for the appellee, Amron, Illinois, is Anne Zare. Arguing for the appellee, Illinois Commerce Comm'n, is Thomas Stanton. Each side will have 15 minutes for their argument. The appellant will also have 5 minutes for rebuttal. The appellees have agreed to split their time evenly, 7 1⁄2, 7 1⁄2. Ms. Zare will go first. Please note only the clerk is permitted to record these proceedings. Good morning, counsel. How is everybody? Good. Good morning. I will do my best to keep on track of the time with the splitting during the appellee's argument. I just ask if you can also kind of keep an eye on that, but I'll try my best to do that as well. With all that being said, Mr. Lang, are you ready to proceed? Justice Bowie, do you see the clock? Do you see what's going on with the clock? I do now. Yeah, it's a problem. Okay, good. A video issue. Okay. All right. Thank you, Justice Cates. Uh-huh. All right. Mr. Lang, go right ahead. Thank you, and good morning, Your Honor. My name is Jim Lang. I'm representing Gridlions Heartland in this appeal. The question before you today is whether Gridlions Heartland is an Illinois public utility because it owns transmission assets that are under the functional control of a regional transmission organization, which is called MISO. The applicable statute here is Section 3-105A of the Public Utilities Act, which says that to be a public utility, you have to own, control, operate, or manage four public use facilities that are used in connection with the transmission of electricity in Illinois. Now, the primary issue we have, the commission's order in this case, is that the ICC conflated public use with nondiscriminatory. But public use requires use by the public in the first instance. Then if you have public use, it has to be available to the public on a nondiscriminatory basis. We're arguing that the commission skipped a step. So what the commission did was essentially substitute offered on a nondiscriminatory basis for public use in the statute, and therefore rewrote the statute. Now, under Illinois precedent, ownership of federally regulated transmission assets, which are what we're talking about here, that are used to supply Illinois public utilities are not for public use. There's a long case history on this. The Mississippi River fuel case that we cite from 1953, in that case, you had federally regulated wholesale sales to two Illinois public utilities. But the court, I would say the easy part of the decision was that that supply to the Illinois public utilities was not for public use. It's not to the public. The more difficult part of the case was that Mississippi River fuel was selling at retail to, I think it was 23 industrial customers. And so that made the case more complex. But because the federally regulated wholesale sales to the public utilities, it was clear to the court at that time, that's not serving the public, that's not for public use. Mr. Lang, didn't Mississippi River talk about the discriminatory use or sale of the power assets? Absolutely, Your Honor. And again, there were two parts to that decision, because you had a utility that was doing these federally regulated wholesale sales to public utilities in Illinois. And they were also selling to individual retail customers, which were industrial customers in Illinois. And so that the question about whether that was being offered on a non-discriminatory basis was related to those sales to those individual industrial customers. Did the court find a public use as to the non-industrial customers? The court found that there was not public use as to the industrial customers. And they also found that there was not public use as to the wholesale sales to the public utilities. Right, they didn't parse out the difference between the two. That's correct. And I would say they didn't, you know, obviously they didn't have to, because in both cases, it's not for public use. But the sale of the power by your client, Gridlions, is controlled by the MISO tariff, isn't it? Correct. So how is that discriminatory? How is that not for public use? Well, and Your Honor, in the first instance, it has to be for the public. The eligible customers under the MISO tariff are not the public. The eligible customers under the MISO tariff are either generators of power, which could be anywhere, or the offtakers of that power from the transmission facilities, which under MISO are typically public utilities. A company like Ameren could be a user of that transmission service. So you're saying Ameren is not a customer for public use? We're saying Ameren is not the public for purposes of what public use means in the statute. How is it that in 2018, your client filed to become a public utility? Yes. So Gridlions filed with the commission, applied to be a public utility. The testimony that Gridlions provided was that their position in whatever state they go into is that typically they do not address or fight the jurisdictional question. So they filed the application. Both staff and Ameren came back and said, you know, we disagree that you are a public utility. Staff said we disagree that you are a public utility because these are the same assets that EEI owned. And we've already addressed the ownership of these assets in prior proceedings and already found that the ownership of these assets does not mean that you own assets for public use. Well, there was no commission finding on that, was there? I mean, the position that you've just taken was never concluded because your client withdrew the petition? The commission finding that the staff was relying on was the commission finding in 2016 regarding EEI. Right, but this is a 2018 petition where your client filed to become a public utility. Yes, correct. So the application was withdrawn after, you know, basically after it was opposed by staff and Ameren on the basis that, you know, that Gridlions Heartland simply owning these transmission assets did not make Gridlions Heartland a public utility under Illinois law. So you had your client in its own mind think that it was a public utility. The staff, you say, opposed it. Then your client engages by transferring assets to MISO for transmission. And now you're opposing the public utility status. Is that true? A slight nuance in that, Your Honor, is that instead of, you know, instead of Gridlions Heartland proposing that they were a public utility, they filed an application with the commission to determine whether they were a public utility. And you're taking the position that you're not? Correct. Okay. Correct. And we think the question that you're getting to about kind of non-discriminatory service, you have that both in the People's Energy case from 1986 that we cited. In that case, you have, again, FERC-regulated wholesale sales under a FERC tariff to public and municipal utilities by this company called Natural Gas Pipeline Company. But the court still found in that instance Natural Gas Pipeline Company was not selling to the public and therefore not a public utility. Now, that whole question in that case about whether Natural Gas Pipeline Company was a utility, it's not addressed, that finding is not addressed by the other parties in this case. They just ignore it because it's not helpful to have a court saying that a, you know, a FERC-regulated wholesale sales to public utilities doesn't make you a public utility in the state. You have the same issue in the Rock Island case that, you know, Illinois landowners, it goes up to the Court of Appeals. Specifically in that case, Rock Island committed that it would have an open access transmission tariff exactly like what we have here under MISO. Rock Island said it would comply with FERC's open access requirements, that it would offer service to any eligible customer pursuant to its FERC-approved open access transmission tariff. Those are facts that are set forth in the Illinois Landowners Supreme Court decision at paragraphs 12 and 14. And despite that, despite having that open access transmission tariff, despite having 75% of the capacity committed to PJM, which is the Regional Transmission Organization in northern Illinois, despite having all that, despite them being committed to providing nondiscriminatory service, the Court of Appeals relied on Mississippi River fuel and said no part of the energy is being transmitted for public use in Illinois. And again, it was clear that it was going to be available on a nondiscriminatory basis to public utilities in Illinois under the PJM tariff. So it would be available, for example, to ComEd, but that doesn't mean that it's available for public use in Illinois. And that's why... What did the Supreme Court say about that? The Supreme Court decided on other grounds, obviously, that Rock Island, because they did not own those assets yet, they had not constructed them yet, that that decided the question. But that doesn't make the Court of Appeals decision wrong. It doesn't make the analysis wrong. The Court of Appeals analysis is still, we would certainly argue, quite insightful as to how you interpret what public use means under the statute, which again... Aren't we bound by the Supreme Court opinion? Are we allowed to go into the Court of Appeals analysis when there's a Supreme Court decision on this topic? Well, there is... We would say there are multiple Supreme Court decisions on this topic, including, for example, Mississippi River fuel. I understand, but my question was, you want this Court to follow a Court of Appeals analysis where the Illinois Supreme Court has considered the same case and spoken. I'm just wondering procedurally whether we can do that. Yes, Your Honor. I mean, it's not binding on the Court because the Supreme Court decided the appeal on other grounds, but the analysis is still sound. And how did that appeal come out? The appeal was that Rock Island was not a public utility under the statute. It went back to the Commission. It was remanded back to the ICC, and the ICC issued an order on remand, which found consistent with the Court of Appeals decision that Rock Island was not a public utility, both because it did not own assets yet, and because those assets were not going to be used for public use. Here we have Gridlions owning assets, though. Certainly. And there's no dispute that Gridlions owns them. There's no dispute that MISO operates them. Isn't MISO bound to hold these as available for public use? Absolutely, Your Honor. Well, as was the prior owner of these assets. Well, excluding the prior owner for a moment, because that gets you to your issue on Ray's Judicata, doesn't it? It's both on Ray's Judicata and simply that the Sangamon County Circuit Court was correct in determining that these transmission assets are not used for public use. Do you think that Ray's Judicata applies to an Illinois Commerce Commission finding? The Illinois Commerce Commission found that Ray's Judicata was not applicable to its orders. Correct. Correct. What do you think about that? We would agree, Your Honor. So, yes, the fact that the commission in 2016 found that EEI was not a public utility, you know, even though it had an open access transmission tariff in effect for about 10 years at the time, you know, that particular order of the commission in 2016 is not Ray's Judicata on the commission in, you know, in 2022. We would agree. The Ray's Judicata argument is based on the circuit court decision and the findings that the circuit court decision made that, you know, EEI using the exact same transmission assets was not using them to offer service to the Illinois public was not off and was that that, you know, they were not offering they were not selling electricity at retail. They were not offering service to the public and not providing electric service to any end users in Illinois. But they had not been transferred to MISO by then. When EEI was being looked at, there was no MISO transfer. Correct. And the question for Ray's Judicata purposes is, should that matter? You know, you just told me Ray's Judicata doesn't apply. Well, it doesn't apply for the commission's 2016 order. The assets weren't transferred until 2020, I think, right? It was 2020 and after 2022 to MISO control. Correct. Right. So by now, they've all been transferred. By now, it's six transmission lines. They've all been transferred to MISO's control. They're all being operated under an open access transmission tariff. They were operated under an open access transmission tariff by EEI for many years. All transmission assets are operated under an open access transmission tariff because that's what FERC required going back to 1996. I think part of the issue that's worth looking at with MISO is that there's no dispute. I believe there's no dispute in this case that MISO itself is not an Illinois public utility. The commission does note in its brief that the Illinois legislature provided in 1997 that MISO shall be deemed a public utility for purposes of two statutory provisions dealing with new construction eminent domain. But MISO itself is not otherwise a public utility in the state. And it's notable that the legislature would not have needed to give MISO eminent domain rights if it already qualified as a public utility in the state. But MISO does not operate transmission assets for public use in Illinois. Which raises the question, if MISO is not a public utility, even though it's operating these transmission assets, how is gridlines heartland public utility when it simply has ownership of the same assets? Well, doesn't the language of the statute use own, own, operate, maintain or control? It says own, control, operate and manage. So you have ownership. Right. You have ownership by gridlines. You have ownership by gridlines. You have operation, control and management by MISO. Right. But MISO is merely a facilitator, isn't it? I would call it a facilitator. They facilitate the transmission of the power. They're the regional transmission organization. And I don't think there's any you know, it's there's no dispute in the record that they are controlling and managing these transmission assets. But, you know, there's there's also no dispute that they are not a public utility. But what difference does that make to the statute? The statute is focusing on ownership, operation, management and control. And I think the word maintain is in there. I think manage. And I think that the difference it makes is the inconsistency of the commission's arguments. And that, you know, that MISO on its on its face, according to the commission, would satisfy the definition of public utility. But but it's not. And the legislature, the Illinois legislature in 1997, had to include specific language in the statutes when they were restructuring the electric industry back in 97. They had to include specific language dealing with MISO because the legislature understood that just that even though MISO was going to be controlling and operating these transmission assets, it was not for public use and therefore they're not a public utility. But under your argument, there may be no public use in Illinois if it's operated by an open, what's the word, an open access transmission company, a MISO, if you will. Under your argument, we may never have a public use. Well, it certainly will defend depend on the facts of the case. And there are obviously there are obviously, you know, many transmission lines in Illinois that are under the the ICC's jurisdiction because of the facts of how they're owned and maintained. And they actually do satisfy the for public use test. OK, thank you, Justice Brewer. Thank you. Obviously, a lot going on in this case. So I think if I looked at the clock earlier, I think there was a little problem in the beginning. And Mr. Lang had a couple of minutes extra in his oral argument. So if Mr. Stanton and Mrs. Zare, if they need a minute or two to make sure they get to their points, obviously, I will will allow that unless Justice Cates or Justice McKinney disagree. No, I agree with that. No, I have no problem. And obviously, I was the one who was causing the problem. So and obviously, Mr. Lang, you're going to have your time for your rebuttal. Mrs. Zare, are you prepared to proceed? I am, Your Honor. Thank you. Go right ahead. Good morning. May it please the court. And there on behalf of Ammon, Illinois Company, as mentioned, my colleague on behalf of the commission, Mr. Stanton and I will be splitting our time and the issues. But we both asked the court for the same thing, to affirm the commission's interim order, finding that Gridlions is subject to the same public utility regulations as other utilities that own and operate electric transmission assets in Illinois. Now, we just heard from counsel who told you effectively, there's nothing to see here. No need, no lawful reason for Illinois to care about Gridlions' business in Illinois. Your Honor, Gridlions is asking you for a pass. It's asking you to excuse it from the regulatory scrutiny that Illinois has for over a century now applied to public utilities to protect the Illinois public's interest and to ensure that Illinois utility customers don't pay for utility assets in Illinois that they don't need and that don't benefit them. Please let me explain. Under Section 3105 and other sections of the Illinois Public Utilities Act, the commission regulates as public utilities, companies that own and operate electric transmission facilities in Illinois, like Ammon, Illinois. And for 20 years, companies that own and operate only electric transmission facilities in Illinois. Gridlions is fundamentally the same as those other public utilities. It doesn't own its assets for any sort of private use. To the contrary, having transfers its assets to the functional control of a regional transmission organization, here MISO, the assets are openly and non-discriminatorily available for use by the electric consuming public in Illinois. And now they're paid for by the public in Illinois. So Gridlions should be subject to the same regulatory scrutiny on behalf of that public as other transmission public utilities in the state. Everyone should play by the same rules. But from that scrutiny, Gridlions is asking to be excused. The court should not grant Gridlions any such pass. And here's why. Sarah, before you get any further, Mr. Lang says that they don't offer these for public use. How do you use the word public? Your Honor, public use is defined as, well, a public use is use that is open to all on the same terms and on the same conditions, so long as there is capacity. And under the terms of MISO's tariff, Gridlions' assets must be held to all within a class, eligible customers, on the same terms and on the same conditions, so long as there is capacity. But what is a customer? So under the MISO tariff, it's defined at the transmission level as an eligible customer. But I would submit to you that where Mr. Lang argues and where Gridlions argues in its briefs that customer means retail customer, that's wrong as a matter of law. Section 3105 and the centuries-old Supreme Court jurisprudence interpreting the statute don't make a retail customer distinction. In fact, to the contrary, the statute says transmission. And as the commission correctly found in its interim order, end users don't typically take service from transmission facilities. I mean, you and I don't tap directly into large transmission lines for service. But that doesn't mean that we don't rely on that infrastructure to turn on the lights. And now customers in the lower two-thirds of the state are paying for that infrastructure when we're talking about Gridlions. Are you talking about the $6 million that's paid through Ramon? Yes, Your Honor, at least that amount. As the record reflects, the cost is substantially increasing because it includes not only that $6 million, but also Gridlions' construction costs, which is estimated at approximately two years ago at $55 million. In addition to the cost of Gridlions' business pursuits, whether successful or not, and whether in Illinois or not, that is according to a regulatory asset, which again, about two years ago, given the time of this record, was at $34 million. So substantially in excess of the cost of the assets themselves. How is it that they're able to pass that on to the, not the retail customer, but the transmission use customer? The cost is passed on to the retail customer. How is that? How does that work? Amron, the cost of assets, of transmission assets within a particular pricing zone in MISO, here we're talking about the Amron, Illinois pricing zone, are aggregated and then allocated across the transmission owning members within the price zone based on consumption. So in this case, Gridlions' assets are included in that aggregation and passed on to Illinois, Amron, Illinois, excuse me, to then be passed on to customers who Amron, Illinois serves in the lower two-thirds of the state. So Amron taps the retail customer for the cost? That is how the regulatory structure works. Yes, Your Honor, that's correct. So one of the questions I've had is why is Amron so concerned about this? What's your skin in the game, so to speak? Well, it's twofold. Amron's a customer of Gridlions. It's paying those costs. And second, Amron is here on behalf of its customers. Amron simply has to pass through Gridlions' costs. But you would do that anyway, whether it's a public use or not. In this case, Amron relies on the assets, excuse me, let me rephrase. Prior to their transfer to MISO, MISO would not have used the assets to coordinate the transmission of energy within its footprint. And therefore, Amron, Illinois would have not incurred and passed on to customers the cost of these assets. After the transfer, even though Amron, Illinois is not specifically using these assets, by virtue of operation of the tariff and their availability to MISO to coordinate for the use of the public within its footprint, the cost is now allocated to Amron, Illinois. And again, by virtue of the function of the MISO tariff and Amron, Illinois' own distribution tariffs, it's passed on to Amron, Illinois customers, whether they use the assets or not. So retail customers are paying for an asset that Amron is not using. That's correct, Your Honor. And we submit that because Gridlions is no different than any other electric transmission utility in the state, whose assets are functionally controlled by a MISO, that Gridlions should be subject to the same regulatory scrutiny. Here, the commission has authorized that scrutiny in directing Gridlions to seek a certificate under Section 8406 of the Act, under which the commission determines whether particular utility assets in the state are needed by the public for service, and if so, if there are lesser cost alternatives. But whether they were a public utility or not, once the transfer to the MISO occurred, then Amron would have been tagged with these costs, is that correct? Under the tariff rules? No, not necessarily, Your Honor. Not if the Illinois Commerce Commission is permitted to continue to do its job here. When FERC approved the transfer, consistent with the complementary and comprehensive regulation that FERC and the Illinois Commerce Commission have, as recognized by the Illinois Supreme Court and the Illinois Landowners Alliance opinion, FERC expressly deferred to the Illinois Commerce Commission to answer a threshold question, and that's whether Gridlions' business in Illinois is authorized in Illinois in the first place. Okay. Thank you very much. Thank you. And if there are no further questions for me, I'll concede the remainder of my time to Mr. Stanton. Thank you, Ms. Zayer. Before we move on, Justice McKinney, do you have any questions? No, sir. All right. Thank you, Ms. Zayer. Mr. Stanton, go right ahead. Thank you, Your Honor. Tom Stanton on behalf of the Illinois Commerce Commission. The commission has regulated transmission-only companies as public utilities for at least 20 years. Since 2003, the commission has issued at least five certificates of public service to meet its necessity, the CPCNs, authorizing those transcos to transact business in Illinois as public utilities. At least three of those transmission-only companies do not directly serve end-use customers. And to your point, Justice Cates, Gridlions understood all this when it first applied for a CPCN back in 2018 in ICC Docket 18-1617. There, as part of its presentation, it told the commission that its business purpose is to optimize the transmission grid for the public use and benefit, and that it will use those transmission assets to provide transmission service to the public, and therefore that it was a public utility as defined in Section 3105 of the Public Utilities Act. However, because the Federal Energy Regulatory Commission denied Gridlions' first application to acquire the transmission assets from EEI during that commission proceeding, and as a result of that denial, Gridlions could not meet the first part of the two-part public utility test, Gridlions voluntarily withdrew its application before the commission could render a decision. Mr. Stanton, did your staff take the position, however? Well, I guess they had to take the position that they weren't a public utility because they didn't have ownership at that time, right? Gridlions, yeah, absolutely. Because you have to presently, as the Supreme Court held in my landowner's case, you have to presently own those assets at the time of the application. Right, right. So the commission correctly found that Gridlions is a public utility. This determination flows from the record evidence and the statutory definition, and is supported by longstanding Illinois Supreme Court precedent interpreting Section 3105. And because Gridlions hasn't shown any error by the commission's warrant reversal, the court should affirm the commission's order. I'd like to first turn to the Third District's Illinois landowner's decision. So Gridlions argues that the court there broadly held that the use of the transmission facilities to deliver energy to an RTO does not render those facilities for public use. But that's not what the court held. And Gridlions ignores the critical facts that form the basis for the court's public use holding in that case. So Illinois landowners concerned a merchant transmission project, and the company Rock Island was not a member of an RTO, did not plan to offer the service without discrimination. It had a three-tier pricing system with varying prices for the anchor tenants, the auction winners, and then anybody else. If there was any additional capacity left over, that would be provided pursuant to an open access tariff on an inferior basis. So Rock Island didn't plan to offer its service without discrimination. It did not designate any portion of the electricity transmitted for public use in Illinois either, and it did not seek to recoup the cost from rate payers. It sought to recoup the cost of its transmission line from the generators themselves. So based on those facts, the third district held that Rock Island's project did not devote assets for public use in Illinois without discrimination. Now, unlike Rock Island, Gridlions is a member of an RTO, and it transferred functional control of its transmission assets to MISO. And as a result of that transfer, those assets must be provided to all eligible customers equally and on non-discriminatory rates, terms, and conditions. In addition to transmission... The fact that you said that it must offer, where does that derive from? That derives from the MISO tariff. That's what I thought. Okay. Yeah, it's directly from the MISO tariff and applies to all eligible customers. Any similarly situated customer that qualifies as an eligible customer can take transmission service at those non-discriminatory rates, terms, and conditions. It's in the MISO tariff. So did you hear the answer to Mr. Lange's question when I asked him whether the fact that they had transferred to MISO regulates the fact that they have to offer it for public use? Yes, exactly. It's the transfer of the control and the consequences of that transfer of control. And the consequences are it subjects those assets to the MISO tariff, and it's the non-discriminatory rate, terms, and conditions. Gridlions cannot refuse customers other than based on the terms of the tariff. If there's a shortage of capacity on the line, the tariff will allocate. That will set the terms for the allocation. It's not simply up to gridlions to decide who it wants to deal with, unlike a private use. So in addition to the private use, you have individually negotiated contracts on varying terms. And so in the Mississippi River case, you had customer restrictions, territorial restrictions on the 23 industrial customers that the Mississippi Rule was selling gas to. You had also non-uniform rates. Mississippi River was charging different rates to different customers. And then also, you know, an important point was Mississippi River could choose who they dealt with. And so the court found, in that case, that there was private sales activity, private use, and they weren't a public utility. Is there a situation, Mr. Stanton, where a MISO can discriminate against its customers? Not under the tariff, no. Like I said, if there was a shortage of capacity on the line, the tariff would provide how that shortage, how the capacity would be allocated. So MISO itself cannot discriminate against, you know, as long as they're similarly situated eligible customers and they qualify for the service, the tariff would provide the mechanism, not MISO in its discretion. It would have to be described in the tariff. So is it true that any time the owner of an asset transfers its control to a MISO that it becomes a public utility? It would become a public use. A public use. Yeah, right, right. So the transfer of control, and again, if the indicia of public use are met, if it's on non-discriminatory terms. So in the MISO tariff that we're talking about with Reliance, the open access tariff, yes, that would be a public use. And if the other requirements are met under Section 3105, then the company would be a public utility, if that's correct. Well, how is it that the Rock Island entity was a non-public use if it had an open access transmission tariff? Yeah, so the Rock Island created a three-tier pricing system. But how were they allowed to do that under the tariff? Yeah, the MISO tariff was not applicable because Rock Island was not a member of an RTO. It was not a member of either MISO or PGM. It was simply delivering the electricity along its transmission line to the RTO. It was not a member. It's the membership. It's the turning over the functional control of the assets. And Rock Island did not do that. So that's why, yeah. So you have to be a member of an RTO. That's the key. Yeah, the membership of the RTO because the consequences of that membership is the assets are used pursuant to the MISO tariff, pursuant to a PGM tariff. Yeah. It's the transfer of control that's important and the consequences of that transfer of control in this case, yes. Okay, thank you. So just getting back to the Rock Island case, those critical differences between Rock Island and Reliance demonstrate that Reliance, unlike Rock Island, has devoted its assets for public use in Illinois without discrimination. And that's exactly what the commission found. I see that there's no time left. Is that okay? If the court has any questions, I'd be happy to answer them. Did you have a minute or two you wanted to wind up? Let me just talk a little bit about the Reliance's argument about their retail customer theory. Counsel for Amron talked about Section 3105. That theory is inconsistent with the plain language of the statute. Reliance's argument departs from the plain language. It inserts a limitation into the text and that rewrites the statute. And also, there's the Chicago District Pipeline case where Reliance's argument of retail customer theory conflicts with that case. There, the Chicago District Pipeline company was a public utility where its only customers were other public utilities along its pipeline. It did not make any sales directly to a retail customer or any end-use customer. So, the Chicago District Pipeline, we think, is on point and refutes Reliance's retail customer theory. I think that's it. Unless there's any questions, we'll rely on the brief. I have none further. Justice McHaney, any questions? No questions. Well, thank you, Mr. Stanton. Mr. Lange, go right ahead with your rebuttal. Thank you, Your Honor. A couple points I wanted to address. Number one, the statement that Reliance cannot refuse customers, absolutely wrong. There is non-discriminatory service available to eligible customers as defined under the tariff, which is limited to a set of, essentially for our purposes, public utilities or generators. If any of your honors were to call in. Wait, you said there's non-discriminatory service available? To eligible customers as defined in the tariff. That would make it public. Right. What would make it public is if it were actually available on a non-discriminatory basis to the public. Okay, I'm confused. You said non-discriminatory service is available to customers. To what's called eligible customers. So eligible customers is a defined term in the tariff. And eligible customers are, as defined in the tariff, are companies like Ameren and companies that own generation. That's it. So, you know, your honors, anyone else in Illinois that wants to take service under this tariff, the open access transmission tariff. No one else can call up and say, I want service because you have the price in the tariff. It's very limited. And it's, you know, so gridliance can't can refuse customers. And in fact, under the tariff, if a retail customer were to call up and say, I want transmission service. As we've just as we explained in our brief, and as I believe it's Aaron Murphy testifies, it's in the Aaron Murphy testimony for Gridliance Heartland. Gridliance Heartland would have to say, no, we're only a transmission provider in the interstate system that's regulated by FERC. We can't supply you, the Illinois public. Well, that's supply. How about charging money? And thank you. So charging, as we've talked about, Gridliance Heartland is regulated by FERC. Its wholesale rates are authorized by FERC and then assessed by MISO on those eligible customers, the participants in that interstate market that is FERC jurisdictional. So that cannot be regulated by the ICC. Oh, but it's non-discriminatory, isn't it? It is. It's non-discriminatory at the federal level. So FERC sets, you know, under FERC rules, transmission, the cost of transmission is recovered at the federal level. And MISO allocates that cost to its members. As Ms. Zare was explaining, one of those members is Ameren. And so that cost, some of that cost is allocated to Ameren. And then under Illinois law, Ameren is permitted to pass through that federally determined cost to customers. But this issue that she raises about, oh, you know, they need the ICC to come in and protect customers from these charges. The place, if they have an issue with the charges, the place to complain about that is at FERC. And they have done that, but they've lost. And so they're trying to drag Gridliance-Heartland into the ICC in hopes that they can get some kind of different decision. So, you know, you would ask, Your Honor, about, you know, what Ameren having skin in the game. And the game that's being played here by Ameren is, in this proceeding, Ameren coming in, filing a complaint, saying, oh, Gridliance-Heartland is a public utility, they have to be regulated. They have to, and they need a CPCN from the commission. So Gridliance-Heartland does have a CPCN proceeding pending right now at the commission. And Ameren is coming in, as you heard Ms. Zare say, Ameren isn't using these assets. Therefore, Gridliance-Heartland is not providing public utility service, and it should not receive a CPCN. So there's this whipsaw going back and forth. I'm sorry, how does Ameren have standing to do this? Ameren can, for purposes of this complaint, Ameren can file a complaint. We have, you know, we have not addressed standing issues. We focused more on just the fact that their complaint was lacking because they're, you know, they could not prove the jurisdictional arguments. But, you know, if I can end on that point that Ms. Zare is saying, these facilities are not used by her client, by Ameren. One of the statutory requirements is public use. It has to be both public, it has to have use. Their position in this case is there isn't use. And their testimony from their Ameren witness hackman is, we're not using them. We don't know who's using them. So on that basis, your honor, we find that, we would ask that you find that the commission erred in finding Gridliance-Heartland as a public utility. And we ask that the court remand with instructions to dismiss Ameren's complaint case. Thank you, Mr. Lang. Before we let you all go, Justice Case or Justice McKinney, do you have any final questions? None, thank you. No, thank you. Well, counsel, again, thank you. We will take the matter under advisement and issue an order in due course. We hope you all have a great day.